The next case on the calendar is MMA Consultants v. Republic of Peru. May it please the Court. Patrick O'Hearn on behalf of the Appellant. I would like to reserve two minutes of my time for rebuttal. There are many issues that are presented in this case, and I'll take a few minutes to lay out what we see as the key issues. But I did want to give a brief chronology to start out. The bearer bonds were issued in New York with the signature and seal of Peru's foreign minister. When issued, they were required to be paid in New York. When Peru failed to conduct the drawings, the bonds became a debt with unstated maturity, only until paid, but still payable in New York. This was all of Peru's making. There was no forum until 2004, when Altman was decided, but even then there was a continuing violation. You could have sued in Peru? Well, we had the ability to choose our forum in the United States. The bonds were payable in the United States. But when you said there was no forum? There was no forum in the United States, I'm sorry, until 2004. But even in 2004, there was a continuing violation. We found the most analogous case to be the New York Court of Appeals decision in Orville. That extends the accrual date or tolls it. The bonds were presented for payment by an Illinois corporation in 2015 to the Peruvian embassy in Washington, D.C. The lawsuit was brought within months of Peru's failure to honor the demand. The strongest evidence for Peru is no evidence at all. A century-old French language arbitration award that did not even deal with payment of the bonds. You agree that the statements in the arbitration award can be admitted for the truth of the statements in the award? No, because judicial notice is not appropriate when the facts are contested. Clearly, the facts were contested. Why aren't the statements in the arbitration award admissible for their truth as statements in ancient documents? Well, I don't believe— 803.16. That's not really what the court did here. The court took judicial notice of the arbitral award is my recollection. But to the extent that it relied on the arbitral award, factual statements made in that document, wouldn't they fit within the ancient documents exception? I suppose they would, yes. But our point, of course, is that the arbitral award actually, if it's considered, is in our favor. And I'll go on now to my other points here. There are five, we think, critical points here. There are many more points, but five critical points. First, the bonds were never paid. The district court finding to that effect, based on the arbitral award, was clear error. The district court said, quote, Throughout the redemption period, CCG credited and debited Peru's account exactly as if the bonds had been publicly issued. By the end of this period, Peru's debt on the bonds had disappeared, close quote. But the arbitral award clearly held that the GCC was not able to obtain its payment on the bonds. The arbitral award said, quote, The only question that therefore arises is whether the certificates are now paid. But this entry specifically shows that the actual depreciation, which is to say, provided from Peru's funds or from the proceeds of the sale of guano, has not occurred. The arbitrators concluded that CCG could partake in the funds that had been set up for the creditors, and that was, in essence, payment of the bonds. But the amount that they, first of all, the specific issue there was how much would they get of the Chilean deposit in the Bank of England, which was only about $600,000. It seems as if it were in the nature of a bankruptcy proceeding, a liquidation proceeding, and so the guano creditors, including CCG, were permitted to partake to a certain extent, but the intent was that that would resolve the debt. Well, no, I don't think it was the intent that that would resolve the debt, because the — Or at least that's what the arbitrators so found. Well, the arbitrators actually found that this was an unusual arrangement, and they said that basically the issuance of the certificates was a type of backup security for the debt. And if the proceeds from the sale of guano or other funds from Peru were not sufficient to pay the debt, then the certificates still were valid due and owing. And that is actually what the arbitral award stated. And they said this is an unusual situation, but that that was — and that was what was set forth in the 1875 agreement, too, between Peru and GCC. Where in the arbitral award does it say that those bonds were still owing? Well, it says that they — it says that the — right where I was referring to in appendix at 450, the only question that therefore arises is whether the certificates are now paid, and it says the company has been unable to obtain its payment. So I do understand that — I mean, and this is why, quite frankly, we say you shouldn't consider the arbitral award at all, because Peru made a very big deal about the fact that it was only going to participate in this arbitration if nothing in the arbitration could be used by — could be used in a subsequent proceeding by a creditor. And now Peru is attempting to use it. This was a situation in which they were trying to figure out who was going to get how much of the Chilean deposit in the Bank of England, but it's very clear here that the arbitration panel found that the bonds had not been paid. I'm sorry. Where does it say the bonds had not been paid? Appendix at 450. And where? Where on 450? It says the only — but this entry specifically shows that the actual depreciation, which is to say provided — I'm sorry. Where on page A450? You know, I don't — All right. Apologies. Thanks. Well, I apologize. I think we must have — we had a miscite there. Well, maybe during your adversary's argument you can find the proper citing. I apologize. It is a direct quote from the — from that. I see that my time is up unless there are any other questions. Thank you. May it please the Court. Owen Pell from White and Case for the Republic of Peru. Your Honors, my colleague has skipped a step. And we can start with the face of the bond, which is dispositive of the case. The bond on the 17th line — this is page A181. On the 17th line of the bond, it says not that there are only bearers in New York, but the bond actually says that either the guano company, which we call CCG, so we don't always keep saying guano, the guano company called CCG in Lima, Peru, is either going to be the holder or there would be bearers in New York. So on its face, the bond actually never created New York as an exclusive place of repayment. In fact, the bond expressly recognized on the third line of page A181 and on the fourth line of page A182, the bond expressly recognized that it was paying off a prior contract between CCG and Peru. So the fact is this bond never set New York as the exclusive forum for repayment and recognized that CCG itself might always be the bearer down in Peru of these bonds. In effect, these bonds protected CCG in case it wasn't repaid. They could go to New York, issue the bonds, take that money, walk away, and Peru would have to deal with bearers. But we know from the arbitration that that never happened, and that was allowed on the face of the bonds. That or is crucial and deflates most of the case. What is left of the case falls apart when you realize that the bonds actually did have a fixed term. On page A181, the bonds were to be called in five tranches, but the crucial language says that any bonds not drawn by March 1, 1880, were to be redeemed, quote, as if they had been drawn. So redemption, and by the way, any redemptions had to be published. If they weren't published, that would have been a breach of contract. And so there would have been an immediate ability to sue on the bonds had they ever been actually circulated in New York. Does the bond address, I mean, suppose March 1, 1880 passes, you still have these things. Do they address whether you can just hold on to them and accrue 7% interest until you decide you want to turn them in? They actually do, because what the bonds specifically say is that interest ceases. And where does it say that? The bonds on page A182, it says that in the second line, interest on this certificate shall cease from and after the day on which the principal shall become payable. Principal becomes payable either the day. But it's not one of those bonds where you can just hold on to it indefinitely and accrue the interest because interest stops. That is precisely correct. I have done many sovereign bond cases. This is different from every single one of them. This was a very particular bond issue tied into a very particular project finance deal involving the mining of guano in Peru. And they were just trying to, there had obviously been disputes. We know this from the arbitration. There had been disputes between the company and the government over the consignment and the export import of guano, which was a pretty hot commodity back then. And the fact was. Who knew? Who knew? Who knew? But the fact is it was like quicklime. It was an incredibly important mineral. And this company in Peru had a history. And this bond was simply a way of securing to the company some ability to know they were going to get money, either from the government of Peru or because they could run to New York and just issue the bonds. In your brief, I think, you keep referring to the fact that the bonds had been paid off. I understand the transaction about crediting the whole value of the bonds and then effectively depreciating them each year. But what's not clear to me from the arbitration is a statement in the arbitration that says the bonds were paid off. I don't see the statement that says the bonds were not paid off, but I don't see the statement that you would otherwise rely on that the bonds were paid off. I agree with you. There is no statement specifically to that effect, but I think you get to the same place through a two-step process. The first step, Your Honor, is we know, we have the arbitrators making a specific finding, that CCG held onto the bonds, made the credit, and took debits. Now, what we also know is that there was more than just the amount in the bonds between these two parties. CCG in Peru had a whole bunch of claims between them. They were all being arbitrated. Your Honor is correct that at the end of the day, there was a net amount of interest still calculated and owed by Peru to CCG, and that was the arbitral ruling, that CCG gets to get some money. But in multiple places, both at the original judgment in 1901 and in 1907, what do we know, Your Honor? We know that the arbitrators keep saying to CCG, if you want your money, you must surrender the bonds to Peru, because what we're doing here is we're truing up the accounts, and you must give them the bonds back. And we know that this money was never collected by CCG, and we know they never gave the bonds back. So what we have, Your Honor, is we have bonds of fixed term, so the Orville case is of no help here to them. We have bonds of fixed term. We have bonds that cease paying interest. If these bonds had ever been circulated in New York, then six years from when they weren't redeemed or published as to be redeemable or when in 1880 they should have all been redeemed and payable, six years from then, someone could have sued. Otherwise, you have a time bar. Why wouldn't it be also reasonable just to assume that CCG had to give the bonds back to Peru, either because they no longer had value and Peru didn't want them out there, or because Peru was being given a credit for the bonds that were still worth something? Either way, this case gets dismissed. And that is why, Your Honor, we didn't actually need to make that a fundamental issue in the case. The fact is, either way, these bonds were due and payable between 1875 and 1880. It appears that CCG, still as of 1901, was holding onto them. By that time, all claims were precluded. There is no other part of the CPLR they can look to for help. This is a standard breach of contract case. And what's most important is that on the face of the bonds, we see why it was not a foregone conclusion that there would ever be a connection to the United States or a direct effect here. So you're not defending that part of the district court opinion that found that the bonds had been paid off? I believe that once CCG, as a bookkeeping matter, Your Honor, credits fully the bonds, and as a bookkeeping matter basically says, I'm no longer owed money on these bonds, but I still have a bone to pick with you, Peru, as to certain interest calculations and certain other monies you owed, I do believe at that point, as a matter of contract law, you've got merger and you're done because they've said we credited the full amount and then we took these debits. So I think CCG did that work for me and I think the district court got that right. But understand, when we presented this to the district court, the reason we were looking at the arbitral award is because these go to jurisdictional facts. The arbitral award, in effect, is like a megaphone. It magnifies what you see on the face and it brings clarity to what you see on the face of the bond, which is that these bonds never circulated in New York. Did anything happen in New York? I mean, things could have happened in New York, but so did anything actually happen in New York? It appears that at least one thing happened in New York. We know from the arbitration that a payment was made to the agent. So in effect, CCG had the comfort of knowing that if Peru reneged, if Peru reneged, CCG knew that everything had been done. The bonds had been printed. They had been sealed and certified. A payment had been made to the agent. CCG had the comfort of knowing it could run to New York, put the bonds out there, get money, and walk away. It could circulate them. It could circulate them. Precisely right. So could you address, your adversary relies on our decision in Shapiro, and I realize it predates more recent authority in the Foreign Sovereign Immunities Act context, but he argues that Shapiro essentially says that issuance is enough because the capital markets of New York are being taken, being availed of. But that's not, I guess there are two problems I have with his reliance on Shapiro. First, you had an underlying U.S. contract as opposed to a contract between a Peruvian guano company and the government of Peru. The second problem is that you did have actual, it wasn't, they weren't just relying on the face of the instruments there. It was undisputed in the case that the notes at issue had been issued in New York and that then there had been a breach. What they don't have here, what they can never have here, is that they can't get around that on the face of the bond, there may have never been New York bearers because the bond says CCG or the bearer, and we know from the arbitration that that or came true. And hence, there was never any jurisdiction, never any breach of contract here, and never a right claim that anyone moved on in the right amount of time. Thank you very much. So, Your Honor, I'm sorry, A883 of the appendix is the Peru translation and A456, but it's A83, I apologize, it's A83, which has the language that I was quoting to Your Honor. It's the third full paragraph, the beginning, where it says, but this entry specifically shows that the actual depreciation, which is to say provided from Peru's funds or the proceeds from the sale of the guano, has not occurred and that the company has been unable to obtain its payment. Okay? Now, the idea that we're talking about some modicum of interest here is ludicrous. Peru introduced the 1907 document from the Ministry of Finance, a recommendation to the Peruvian Congress, that they pay CCG $7 million. That's more than the amount of the bonds. And that in order for that payment to occur, CCG had to give up the bonds. So, as of 1907, the bonds were due and owing. Peru admits this and admits the full amount of the bonds was due and owing, and that's the 1907 document. Much has been made about this servicing. Even the district court talked about the servicing being simulated. This was a bookkeeping thing. If the funds were not sufficient from the sale of guano or some other source to pay the certificates, the certificates were still due and owing. That's clear. Now, cutting off of the interest, but the principle is still owed. Even if we do not take into consideration the idea that there is no fixed What is the commercial activity in the United States or the direct effect? I mean, what are you alluding to? Well, the commercial activity in the United States is the issuance of the bonds in New York. And not only did the court find that the bonds were The court said that the bonds were executed in New York. The 1875 agreement says that the bonds would be issued in New York. The arbitral award said that the bonds were issued in New York. And so it's the issuance of the bonds in New York, and that's enough under Shapiro. Shapiro says the very presence of such highly transferable instruments, whether or not the initial holder successfully discounts them in the country, suffices to satisfy the substantial contact requirement of the statute. That's it under the first prong. Now, you asked about what's the direct effect. The direct effect is, as in Atlantica Holdings, this court said post-OBB, said the direct effect is the decision outside the United States to breach the contract and the contract that breached causing a financial loss in the U.S. Atlantica holds that a financial loss of a U.S. entity is sufficient. But I do want to mention one thing about the drawings here. There's no fixed term here. These drawings were the time of payment, but the core obligation was Peru's obligation to pay. When Peru failed to conduct the drawings, that threw this into an entirely different situation, and Peru is not allowed to benefit by that. The district court felt the drawings were a condition preceding. They weren't a condition preceding. We go through that very carefully. The district court also maybe impliedly felt that they were a material term. We go through that as well. They were not a material term. I think I'm out of time. Thank you. Thank you both. We'll take the matter under submission.